The next case is Korte Construction v. Secretary of the Army, No. 24-2232. Mr. Wilson, when you're ready. Thank you, Your Honors. May it please the Court. Korte Construction Company was the appellant in this case. This case involves an appeal from the Armed Services Board of Contract Appeals. It involves only legal issues. Interpretations of a contract are clearly established to be an issue of law. Whether there's an ambiguity is an issue of law, and the result is that this Court has de novo review. Two issues basically are involved in this case in terms of what to interpret. They are beyond the hangar, dealing with the fuel hangar, was beyond the hangar three lines that are on the drawings and the spec information with respect to extend base wide chilled water. Did that require chilled water piping? And the second was, was there a valve vault required as contract work? Can I ask you about the valve vault really quick? Yeah. There's the language that you just referred to in paragraph 4.5.6. After that language about extending the base wide chilled water, there's language that says provide connection location for future projects. What could this mean other than a valve vault? It could be a connection at the building to bring in, to have further connection. It could be another valve vault. It's not clear. Is that the problem? It's not clear. You should have asked the government about it before you submitted your pricing. Well, I don't think so because it's the designation, Your Honor, in the drawing doesn't designate a valve vault. No, but the question is whether there's ambiguity, and certainly there's ambiguity here. I do not agree, but I will touch on that, Your Honor. And so in connection with the drawings, let me start with a couple of basic principles. This court has clarified the principle in HB MAC v. United States that a proper technique of contract interpretation is for the court to place itself in the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents. The burden, we believe, was on the government because they were seeking a credit, that they had the burden of proof, and, in fact, the core board made that determination of law. You can certainly disagree, but I think there's a case law that says when the government seeks a credit. I don't think there's any dispute about any of this. The finding of the board was the contract documents were ambiguous. You knew specifically about this ambiguity. You failed to inquire, and, therefore, it's on you that you didn't provide what the government thought these documents required. I think there needs to be a very careful dissection of what we're talking about, and then I come to a different conclusion. So, first of all, is there a requirement because of the base wide chilled water language in the specification? And the only competent evidence in the record on that was Mr. Jarrell, mechanical subcontractor who was also an engineer, and he said that was impossible. So, obviously. But doesn't that simply reflect the ambiguity which is at the heart of this case? I don't think it is an ambiguity. And he reached a conclusion that, well, that's just impossible to bid because it doesn't make any sense. But he took a chance by just saying, okay, let's just ignore this. There's no case rendered by this court where there's an impossibility in the specification that indicates there's a duty to clarify. None. Maybe this is going to be that one. I mean, how can that not be the case? If a contractor gets bid documents that says you have to do steps one through four in doing this contract, and the contractor knows there's no way you can do four, doesn't it have to go back to the government and say we can't do four? There's no way we're going to put four in our proposal because it's impossible. Or can they just assume the government didn't actually mean it? In the context, we're supposed to take into context the contemporaneous circumstances. The government started with RFP 1. Let me answer my question as a hypothetical first. The contract requires four things. It doesn't matter what they are. It requires four things. It's sent out to a bunch of contractors. And a contractor says there is no way that number four is possible. We can do one through three. Four is impossible. Can't be done. Can the contractor submit a bid for one through three and ignore four without telling the government in advance that it's ignoring four because it's impossible? I believe the answer is yes, and I know you disagree. I know you're the one that counts. What's the legal basis for your answer? Because there's no court case. The purpose for the duty to see. When you say there's no court case, first of all, there is plenty of court cases saying contractors are bound to inquire about ambiguities. And possibility is even more than an ambiguity. So it's just flat out wrong to say there's no precedent on this issue. If you're talking about has any court said you have to inquire about impossibility? I don't know. Maybe not. But clearly, that makes sense. If you have to inquire about ambiguity, you certainly have to inquire about impossibility. Why wouldn't you? What legal rationale could you say a contractor can just ignore plain language in a contract requiring them to do something impossible? Because in the circumstances of this case, you could. I'm not asking about the circumstances of this case. I'm asking about my hypothetical, which you seem to suggest even if it's clearly impossible, the contractor has no duty to inquire from the government. I don't understand that argument at all, and I don't understand any legal basis for it. Frankly, you're wasting your time holding on to that. You should probably get to whether or not this actually created an ambiguity. Also, what about cases like seaboard lumber versus the U.S.? This is one of our cases where we held that the doctrine of impossibility really applies when it's after the contract is made that it seemed to be impossible. This defense requires that some supervening event make performance impossible. I read seaboard. I didn't understand it to mean that. I think it had a rule that said if there's an impossibility, the contractor has no obligation to perform that impossibility. What it says specifically, it's talking about after a contract is made. And you knew of this impossibility, alleged impossibility, before the contract, consistent with what Judge Hughes has been asking. I know that Judge Hughes doesn't want me to get into the context, but I think the context does count. No, you can get into the context. You're insisting on a legal argument that is a clear loser. I don't understand why you don't concede the main point and try to move into it. The point is the board found there was an ambiguity here. Your client knew about it and had a duty to inquire, and you didn't. Where did the board err in those conclusions? All right. Well, I will indicate that as part of what was happening here, the RFP1 indicated that we're going to use chilled water to provide the cooling capacity for the hangar. RFP Phase 2 changed that and allowed condensed cooled air. And so there was an option. If you look at 4.2.3 of the specifications and you look at 4.4.4, that was the option. And so, therefore, chilled water no longer became necessary. Isn't it kind of, this isn't the language. It says extend the base, wide, chilled water, hot water, and compressed air piping. And you interpreted that as being all you had to do was compressed air piping. The other things were optional. But that was an and there. It didn't say or. No, but how do you extend something that doesn't exist? That's what you had to ask the government before you priced this out. With all due respect, I think when it was very clear that they shifted to, we'll allow you to use condensed air. Therefore, it was very clear we wouldn't be here. I think it is clear if you read the specifications. Do you think the specification combined with the drawings, which specifically have pipes labeled CW, which you had to understand is chilled water, is very clear? You're into your rebuttal. You can answer and go on, or you can save the remainder of your time. Let me just make a real quick argument. Assuming the court, as it's leaning, that this is ambiguous, I don't consider the base. That was an impossibility under the specification. Under the drawings, I understand it mentions CW, but it doesn't go through the protocol, as Mr. Jarrell pointed out, that is for every other line that's on that drawing that was contract work. The fire line, the domestic water, the other lines, they all went through that keynote schedule and on drawing C002 in the legends for the proposed work. That drawing, to me, is a latent ambiguity at best. We didn't have a duty to seek clarification as to those three lines. Your Honor, I'll reserve the rest of my time for rebuttal. Good morning, Your Honor. May it please the court. Good morning. In its statement to the board, Cordy made dispositive admission against interest. It referred to an appendix page 118, which the board quotes. It's actually appendix page 237, where Cordy tells the board that the specification and drawings were akin to a scrivener's error, suggesting that it was permissible and normal or reasonable for Cordy to interpret language of the specifications as having no meaning, as being inoperative. And as we pointed out in our brief, we cited, for instance, this court's decision at Coast Federal Bank. The contractor in the court is required to interpret contractual languages giving meaning to every language. There's no license. There's no case that I'm aware of that provides any contractor with license to openly treat language as inoperative and superfluous and without meaning in a contract specification. Even if it was a scrivener's error? If it were a scrivener's error, it had a duty to ask. Other offerers asked about this language in question. It was publicly available to Cordy. What the response was, I think Cordy found the acquirer's response to these inquiries unhelpful. That put even more of a burden on Cordy to ask for clarification. It can't simply just unilaterally declare language in a specification and on a request for a proposal as inoperative and having no meaning. There's no case that supports that position. Can you just spend a minute to talk about where in the RFP it specified the provision of the valve vaults? The valve vaults seem to be a little obscure to me. I mean, beyond ambiguity, I'm not even sure it's there. Well, we cited the various appendix pages in our brief, calling for chilled water, piping, and there are two pictures of the vaults. There's the vault notations. But there's no detail or discussion about what they would be, how big they would be. I mean, no detail whatsoever. That is true, Your Honor. Which really raises a question in my mind as to whether the specification for a valve vault was there at all. We do, and I forget what page of our brief, we do cite two specifications and drawings that show the valve. It's not clear. I know in one of the drawings, one of the valve vaults is shown in bold. Yes. That's a tiny hook. It's a tiny hook, and at my age, I had difficulty looking at the drawings because the font is so tiny. I'm with you there. I had to blow it up on my phone in order to see it. I mean, Brian Bird, who wrote the brief, helpfully blew up some of the pictures of the specifications in the brief for those of us who can't read tiny font. The point is, this is a contract within an ongoing project with a lot of neighboring activity and projects going on. This is a specific contract within an ongoing iterative developing project. That's why, for instance, the language that Judge Stoll pointed out, they were supposed to put chilled water piping in and then leave a connection for the future. Again, if they were confused about that, they could have asked the court. They never asked the court. I think that's your point. The point is that even if the hook is tiny, it was there and it was their burden to inquire. Absolutely. The moral hazard of what they did, and this is speculation on my part because we don't know how much everyone bid. This is a half a million dollar deduction in a $72 million contract. By deliberately not inquiring and not pricing this work, there's an issue. They say in their reply brief that we haven't pointed out to the fact that they were aware of it. Pre-award on page 20 of their reply brief, they say the government's presumption that nothing in the record suggests that a reasonable contract should have been aware of this ambiguity. Mr. Jarrell testified, and Judge Stinson and the board had to point out the error of his way, that this was a requirement that was added. It was a holdover from phase one. In fact, these new specs that they're complaining about were added in phase two, and they repeat that same language. They do the black quote from Mr. Jarrell's deposition in their opening brief, even though Judge Stinson pointed out to them that that's a factual error. It wasn't a holdover. But to go to your question, they had a duty to inquire, and the moral hazard is by unilaterally deciding that they're not going to price this contract, or this part of the contract, unlike the other competitors, it might not have been dispositive, but they're getting a competitive advantage because they're deliberately not pricing part of the contract. What consequence, if any, is the fact that the valve vault is not mentioned at all in the specification? That's an ambiguity. Again, that's an ambiguity. Is it an ambiguity, or is it just an indication that that's just not part of the contract, period? Even if it might be shown somehow in the drawing. We've already agreed. It's a little tiny book. I wish Mr. Bird were here, because he identified, and I have the specifications, although I'm not sure which one. There are two of the drawings that do show the valve. It may not be very clear, but they do show part of the valve. The specification doesn't describe anything. Right, right. Can I ask a question? I was thinking about this very issue, and so my question that I asked opposing counsel was, what does the language provide connection location for future projects mean, following the language about providing the chilled water? Is that a valve vault, and what else could it be? I mean, what would somebody – is there any testimony or evidence at all about what somebody who reads this, could provide connection location for future projects, how they would interpret what that means? No, because this was on summary judgment, so there was no hearing at the board about this. But what is clear with all the materials provided to offerors here is that this was one of many projects and that there was absolute consideration of future projects. So Cordy's insistence, and the reply brief is quite floored in suggesting that there needs to be a connection location. A valve vault is one possible connection location. Yes. Is that right? Yes.  And, again, to the extent there were any ambiguities, there was a duty to inquire. There was no – again, nothing authorized them to unilaterally remove language they don't like from the RFP and not price it. Even if we found the specification doesn't say anything about valve vaults, if the drawings show it, there's a general principle that the specification controls over the drawings. But if there's a conflict, there still has to be a resolution of that conflict. Absolutely. Yes, sir. Are there any further questions? Thank you. I apologize, but my reading of the tiny font wasn't perfect. Your Honor, on the last point, the drawings don't clearly indicate that's a valve vault. It doesn't match what a valve vault is. In C001, they have a drawing of a vault. It's got a little hourglass-type figure in it. Those rectangles don't have that. So there's no mention of a valve vault in drawing CU101. Is there something in the legend that looks like what's in the drawing? That is the two – it's two boxes, not just one, but a box within a box without an hourglass. I was looking. I don't see anything. No, there's nothing. That's just a rectangle. So it's something. In the legends, it's nothing. I mean, there's just no indication. But why doesn't that make it raise a duty to inquire as to what it is? It's in the normal drawing it would. But this drawing goes through past, present, and future. It doesn't just deal with what the contractor has to put in. Some of the lines are preexisting, and some of the lines are future. The ones that are future are bold, and the ones that are preexisting are not. The ones that are preexisting, it's not clear on that drawing. But they're clearly not contract work. The way you look for the contract work is the keynote. And there's a keynote on manholes, but there's not a keynote on that rectangle, on either side of the rectangle. So I'd like to quickly mention the Scrivener error. We acknowledge. We believe it was a mistake because it went from RFP1, where it was going to be a chilled water base-wide system. That was clear. If you go to HVAC – Can I ask another question? I'm so sorry. Sure. This is a question. On this very drawing you were talking about with the double box, it has some language that my eyes aren't good enough to really see. But if I remember correctly, it says something about they must be valved appropriately. It's box D under the general sheet notes. I was wondering whether that, because it's talking about having a valved connection, whether that suggests a valve fault. No, not necessarily, Your Honor, because there are different types of piping. There are seven types of piping on that drawing. There's domestic water. There's fire water. There's industrial water. And so that doesn't tell you that that's dealing with – Because all utility infrastructure extending to New Apron is to be valved. That begs the question, though, whether those three lines and the boxes were intended to be worked for this project. And so we do say it's scrivener error. But it's clear what happened. And I think the circumstances, metric construction versus U.S. were supposed to take into account those circumstances interpreted in the contract. And the major change that went – and Mr. Jarrell testified about this. His testimony is actually supportive of our position. The government thinks it's not. And he says they went to not a base-wide system for any of this. They went to a specified system dedicated for that hangar. So whether we went with condensed cooled air or we went with chilled water, we had that option. And there are chilled water specifications in 4.4, but they go to the building. In fact, it says chilled building system in that specification. So it's clear there was a shift to no longer do we need – we're going to have a base-wide chilled water system. So I think that needs to be taken into account in trying to interpret the entire contract document. Thank you. Thank you. Case is submitted.